The Chancellor.
I do not see anything in this case to justify me in going behind the decree of this court of the 7th of February, 1887. No one can question it, except a party to that decree, or some one whose rights are impaired by it. If its object was to defeat creditors who then had existing claims, or to protect the property of the mortgagor from future creditors, such creditors would be at liberty to impeach it. The complainant does not claim under any party to the decree. His lien upon the mortgaged premises was acquired subsequent to it. He does not impeach it for fraud, mistake, or accident; on the contrary, the bill admits that the decree was entered in good faith between the parties. Nor is there anything connected with the suit, or the manner in which the decree was entered, or in the claims upon which it was founded, to justify the court in refusing to protect and enforce the rights of the respective parties under the decree. The rights of the complainants under it are not controverted; but it is the claim of Asa S. Colton and his wife, and of William Schenck, that is questioned.
But as this is a. case of great interest and importance to the complainant, and as he must be an innocent sufferer and remediless, if he cannot obtain relief in this suit, it may afford him some satisfaction to know that the court has not neglected to give due consideration to every feature of the case, presented by his counsel with an ability which, in a doubtful case, would have commanded success.
What then was the claim, upon which that part of the decree in favor of the Coltons and of William Schenck *29 was founded ? Joseph Schenck, the grandfather of Margaret Colton and William Schenck, bequeathed to them, by his will, two legacies, one of $8547, and another of $1958. The testator made this last legacy a lien upon his homestead farm which he had devised to his son John C. Schenck. The will directed the legacy to be paid in three annual instalments without interest, and his executors, John C. Schenck and Elias T. Schenck, to invest the same, and apply the interest to the support and education of the legatees until they should respectively arrive at the age of twenty-one years, at which periods their respective proportion of the principal was to be paid them. John C. Schenck mortgaged one hundred and fifty-three acres of the homestead farm (the whole farm embracing two hundred and fifty-three acres) to Caleb and Enoch Johnson, for about $8200. The Johnsons filed their bill to foreclose their mortgages, and made the Coltons and William Schenck parties defendants in the suit, alleging that they claimed some lien by virtue of the legacy of $1953 under the will of their grandfather. John C. Schenck, only, answered the bill, and he set up the legacy as a subsisting lien, alleging that no part of it had been paid. The complainants filed a replication. The parties then, by their respective solicitors, entered into the agreement in writing, and in conformity to this agreement the decree was made. It is now said, that the legacy was not, at that time, a lien on the mortgaged premises, and that no decree should have been entered for it. That this legacy had not at that time been actually paid, is beyond dispute. How, then, had the land been released from the encumbrance ?
Eirst; it is said that the settlement of John C. Schenck, • as executor, in the Orphans Court, operated to release the land. In the final settlement of his accounts, John C. Schenck prayed allowance for this legacy, and it was charged to him as executor: it is insisted, that by this settlement, the land was released. In the account, *30 which. I have before me, this legacy is not allowed. If there is an exhibit showing this allowance, it has escaped me. But admitting that such settlement was made, how does it operate to release the land from this legacy ? The will directed that the legacy should be invested, and the interest appropriated for the benefit of the legatees; and it secured the payment of the legacy, by making it a lien upon the land. Could John C. Schenck discharge the land by simply charging the legacy to himself as executor ? If he could, the land was no security for the legacy; and the legatees had nothing better than the mere personal security of the executor. The will makes the legacy a lien upon the land until it is actually paid. Suppose the executor had prayed allowance for payment of a debt owing by the testator at the time of his decease, could he plead, or set up in any way, such an account as payment or settlement in a suit brought against him for that debt? Much less could he, when he was the debtor, by any such act change the character of the debt, or its security. But, besides, Margaret and "William Schenck were then infants. Under such circumstances, whatever the accounts of the executors before the Orphans Court may show, they cannot be permitted to operate, in the slightest degree, to the prejudice of these defendants.
Again, it is insisted that the marriage settlement between Margaret Schenck, Asa S. Colton, and John C. Schenck, operated as a legal release and discharge of the mortgaged premises from the said legacy; The object of that settlement was to make John C. Schenck a trustee, in order to secure to Margaret her separate estate free from the control, and liability of her intended husband. The question is, whether there is anything in the settlement to show that it was the intention of the parties, by that deed, to release the land, and to take the personal security of John C. Schenck for the legacy, or whether the legal construction of the deed must necessarily produce that effect ? The deed, sifter reciting particularly the *31 character of the legacies, then recites further as follows: “ And whereas the said Margaret Schenck, one of the children of the said William C. Schenck, deceased, hath attained the age of twenty-one years, and hath had a full settlement with the said John C. Schenck, acting executor of the said Joseph Schenck, deceased, on which settlement there appears cine to the said Margaret Schenck the sum of $4256.92 from the said John C. Schenck, executor as aforesaid; and whereas a marriage is agreed upon and intended to he shortly solemnized, hy and between the said Asa S. Colton, of the first part, and the said Margaret Schenck, of the second part, and upon the treaty of the said intended marriage it was agreed upon, and that the said Margaret Schenck should assign, transfer, or otherwise convey, the fortune to which she is entitled under and hy virtue of the last will and testament of Joseph Schenck, deceased, her grandfather, or from any other source whatever, unto the said John C. Schenck, upon the trusts herein after expressed and declared of and concerning the same.” Margaret then formally assigns to John C. Schenck all and any sum and sums of money which she was entitled to under the will of Joseph Schenck, deceased, and all the property which at law or in equity she was entitled to, to have, hold, take, and receive the same in trust for the said Margaret until her intended marriage; and immediately after the solemnization thereof, to place out the same at interest on bond and mortgage, or otherwise, as the said John C. Schenck might think best, and to change and alter,” &e.
I have referred to all the parts of this deed upon which the complainant relies to show the intention of the parties, and the legal effect of the deed upon the question in controversy. I do not see anything in the deed to show that it was the intention of the parties that its mere execution should deprive Margaret Schenck of the then existing lien upon the land for her legacy. Nor do I consider that such is the legal construction or effect of the *32 deed. The deed recites that there had been a settlement between the parties, and that a certain sum was found due from John C. Schenck to Margaret Schenck. There was no payment of the amount due, but it was merely ascertained by the settlement what that amount was. All her claim, both at law or in equity, she assigns to John C. Schenck, as her trustee. She assigned the legacy, and the security for that legacy. Because the trustee was the owner of the fund which was the security for the debt, did the assignment of the debt and security to him, as trustee, release the security ? Unquestionably, if another person had been created the trustee, the assignment to him of the debt would not have released the lien until the debt was actually paid. If it can be shown that John C. Schenck, in pursuance of his trust, did invest the trust fund on bond and mortgage in good faith in pursuance of the trust deed, then the land provided by the will would have ceased to be a security on the legacy, because such investment would have been a payment of the legacy to Margaret Schenck, or to her trustee, which is the same thing. It is apparent that the money was never raised to pay that legacy; that it existed in no other way than as a debt due to Margaret Schenck from John O. Schenck, secured upon his land, and that while that debt and security were assigned to John O. Schenck, as trustee, with power to change the security, it never was in fact changed. In equity, John O. Schenck would never be permitted to interpose that trust deed as a defence against a claim of the legacy as a lien upon the land. The fact, that this lien was subsequently transformed into a decree in Chancery by the consent of all the parties to this deed, was notice to any subsequent creditor of John O. Schenck, as to the intention of the parties to the deed, and places such creditor in a situation no better than that of John C. Schenck himself, as to all the rights involved in that instrument.
These were all the questions that appear to have been in controversy between the parties in the suit upon which *33 the decree was founded. They were considered as fair matters of controversy. The claims of the mortgagees, and of the legatees, were both meritorious. All who liad any interest in the questions involved were represented, and the controversy was compromised. The decree is final and conclusive between all the parties to it, as well as all persons claiming under them, unless it is impeached for fraud, or can be shown that there was some mistake which a court of equity ought to rectify.
The next position taken on behalf of the complainant is, that the decree has been satisfied. Before examining this part of the case, however, it is proper that I should not overlook a matter of much controversy between counsel on the argument—the validity and effect of the agreement upon which the decree was entered. On behalf of the complainant, it was contended that the decree must be enforced according to the terms of the agreement. On behalf of the defendants, counsel insisted that the agreement is not binding on their clients, because their solicitor had no authority from them to make it, and because it was not within the scope of his retainer, as their solicitor, to enter into such an agreement on their behalf. I think the solicitor had not the power to enter into an agreement, by which the lien of his clients upon the mortgaged premises was postponed in payment to a subsequent encumbrance. 'He had no right to do it fo,r a pecuniary consideration, nor in consideration that it prevented further controversy in the suit. An attorney has no right to give up the security of his client, unless he receives actual payment, or is specially authorized to do so. Tankersley v. Anderson, 4 Dess. 44. The authorities are numerous and very uniform against the authority of an attorney, without special authority, to enter into an agreement of this kind. But I think there is evidence enough of the acquiescence of the defendants in the agreement to infer that the solicitor had special authority *34 to enter into it, to make it binding on tbe defendants. Tbe defendants deny all knowledge of the agreement ; but many years have transpired since it was made, and it may have escaped their recollection. They settled another important suit under it, involving a much larger amount of money, and it is difficult to conclude, under all the circumstances, that in the subsequent transactions the agreement was studiously concealed from them. If so, it was a fraud upon them. But certainly their conduct shows, and particularly their willing acquiescence in the wishes of their uncle, John C. Sehenck, that there could have been no object in concealing from them this agreement. But I cannot perceive that this is a question of any moment in the case. The defendants do not seek to enforce the decree in any manner which is a violation of, or inconsistent with that agreement. The complainants in that suit have been paid their debt; they have no further interest in the agreement. • The complainant in this suit has not, as I can see, any rights which can be protected under it. If the property was sold under the decree, the complainants were to be first paid. They have been paid without a sale of the mortgaged premises. If the property is now sold under the decree, the complainants in that suit have no debt to be satisfied out of the proceeds, nor does the complainant contend that he is to he subrogated to their rights.
Has this decree been satisfied ? If it has, it must have been by actual payment, or by the receipt of some specific thing given and received in satisfaction, or by release. A release is not alleged; nor is there any evidence of the defendants having received any specific thing in satisfaction of their claim. As to payment, the bill states “that; in what way the legacy due Margaret and William was satisfied, the complainant, at this distance of time, and in consequence of the death of John 0, Schenck, has not been able to ascertain, but that it was considered settled *35 between tlie parties, and that with that understanding a loan was made on tlie encumbered premises, which the present mortgage of the complainant represents.”
The testimony of Mr. Green and of Mr. Meld is, that they understood that the decree was settled by the parties, and that John C. Schenck represented it to be settled. But no one says that either Colton, or his wife, or William Schenck, was a party to that understanding. Ho one says that either of them was present when any such understanding was had, or that they assented to it. Was there any one authorized by them to bind them by such an understanding ? Mr. Green was their solicitor, and he says he had no communication with either of them upon the subject. He was not authorized to bind them in such an agreement. .Nor could John C. Schenck bind Colton and wife, although ho was Mrs. Colton’s trustee. Situated as he was, the common debtor of all the parties to the decree, for him to have executed an actual release without receiving payment or satisfaction would have been a fraud, and such release would have been void. IIow, then, can this court, upon the allegation of the most respectable witnesses that they understood the decree was settled, and that such was the general understanding of the parties, declare this decree satisfied, when it appears that these defendants were not present at such an arrangement, and in the absence of all proof that they were cognizant of such an understanding ? But it is said that their future conduct showed an acquiescence in this understanding, and that they had relinquished their rights under the decree.
It is not pretended that any memorandum in writing was made as to any arrangement or understanding, nor can any witness tell the terms of any arrangement, either verbal or written, upon which such an understanding was founded. The declaration of Colton and wife, that the decree was satisfied, would not bind them. A debt of record cannot be released by parol. How far such a de *36 clarátion may bind a party as to one who upon the faith of it has advanced his money, is another question.
The docket of the shériff is appealed to as evidence of the settlement. On the 30th of March, 1837, Mr. Field, as the solicitor of the complainants in that suit, gave to the sheriff a receipt for $10,203.99, in full of the principal and interest due the complainants. On the 22d of September following, Mr. Green made the following entry, at the request of the sheriff: “ 1837, Sept. 22d. Stay further proceedings on the above decree, as respects Asa S. Colton and TPm. Schenck, till further orders. Jas. S. Green, their solicitor." Mr. Green says he considered the decree as settled, and that is the reason why the entry was made. But the receipt itself will not bear such a construction. He does not say he was authorized by his clients to enter satisfaction. His general authority, as solicitor, did not authorize him to settle that execution in any way, except by receiving the money. The receipt he gave involved him in no such responsibility as a receipt for the satisfaction of the decree would have imposed upon him. The solicitor having no authority to enter satisfaction, if the entry he did make could be construed to have that effect, he would be responsible to his clients for the amount due them on the execution. Such a construction cannot be put upon it, and it could not have been so intended by the solicitor. That entry is evidence, that at that time the execution was not settled, and that the solicitor was not willing to give the sheriff a receipt to that effect.
There is another matter in connection with the receipts in the docket. On the 30th of March, 1837 the date of Mr. Field’s receipt the homestead farm of John O. Schenck was sold by his assignee, under the general assignment made by Schenck,.for the benefit of his creditors. The sale was made subject to this decree and execution, and the property was purchased by "William Gulick for $67. On the same day, the mortgage was executed to Bishop, on the 157 acres of the homestead, for *37 $5969.46. The bill alleges that the mortgage was made cotemporanoously with the settlement of the execution. Mr. Green, in connection with this subject of the sale, says, “ The arrangement, as I recollect, was, that the assignee should sell, and John Oulieh become the purchaser; that money enough should be raised to discharge the decree, so that a dear title might be given to the man icho should loan the money, and that idea was carried out.” Was this done on that day? Was this arrangement carried out ? Was there money enough raised, or borrowed, to discharge that decree ? Such, undoubtedly, was the intention of the parties. And this accounts for it, why it was that Colton and William Schenck were not there, and were not consulted about the arrangement. If the settlement had been completed, as contemplated, and. money enough raised to discharge the decree, their assent was not necessary. Only part of the arrangement was carried out. Money enough was raised on that day to discharge a part of the decree, and it was discharged. It appears to me that this evidence shows conclusively that the decree was not settled on that day; that it was understood it should be, but that the understanding was not carried out. It was the disappointment of this expectation that led to all the embarrassments and misunderstanding that followed. John C. Schenck undoubtedly intended to pay oil’ the decree, and subsequently made every effort to do so. If he did not succeed, the defendants are not to have their liens postponed to a subsequent encumbrancer, unless it can be shown that, by some act of theirs, he has been induced to loan his money upon a false security.
But for the complainant, it is further contended, that by the subsequent conduct of the Coltons and William Schenck, they abandoned their rights under the decree. It is asked, why was this decree allowed to sleep for eleven years? John C. Schenck was dead. Slo mere respect, or kind feelings for their uncle, could have induced the defendants to acquiesce in this delay. The only answer given is, that *38 they did not know what their rights were. I can only say, that the evidence, and the character of the whole transaction, satisfy me that this fact should not prejudice the defendants. Let us exatnine the specific acts of the defendants relied upon as evidences of the abandonment of the decree.
First; as to "William Schenck. It is said he presented his claim to the assignee of John C. Schenck, and that it was passed upon by the court, and rejected by the court. The only evidence respecting this is an exhibit showing an order made by the court upon exceptions filed to the claims of certain creditors. The order declares, “ the claim of John O. Schenck, as executor of Joseph Schenck, for the legacy of William Schenck of $4843.11; the claim of Enoch Johnson of $2646.23; the claim of Caleb Johnson of $15,583.88 i the claim of Isaac Story, executor of James Stoddard, deceased, of $2566.32, having been paid out of the real estate, the court order that the same be not allowed. This order shows that William Schenck was no party to the proceedings; that he did not himself present the claim, but that it was presented by John C. Schenck, as executor. William Schenck, then, is neither bound by the adjudication of the court upon his claim, nor can he be prejudiced by the fact, that his claim was presented. But if he had presented the claim himself, that circumstance would not have prejudiced his rights under the decree. The Orphans Court might properly have turned him over to his lien upon the land, unless he would consent to release it for the benefit of the creditors at large.
As to Asa Colton and wife’s acts under the assignment Of John C. Schenck. In August, 1886, six months prior to the decree, John C. Schenck, as trustee, presented a claim to his assignee for the amount of $4843:11. This amount included the legacy in question, and also the other legacy given to Margaret by the will of Joseph Schenck. To the claim presented, John C. Schenck annexed his affidavit; and, on the same paper, Asa Colton and wife *39 made tlieir affidavit that the sum claimed was due, as stated in the account. On the 1st of November, 1837, John O. Schenck received a dividend on the claim, as presented, of §486.73, and in the receipt he gave for it, calls it “ the first dividend on the claim of Asa S. Colton and wife, which I receive as their trustee. August 31, 1841.” John C. Schenck, as trustee, received from the assignee §685.30, and gave a receipt for it “ in full of the second and last dividend of said Sehenck’s estate upon final settlement.” The receipt of these dividends did not operate in law as a release of the lien upon the land. It was not contended that the lien was at all affected by the statute under which the assignment was made. But it was said that these proceedings show that the decree had been abandoned. Such was not the legal effect of those acts of the parties. If such was their intention, they have a right to repent of it, and no one can question that right, unless he can show some other legal or equitable discharge of the debts than can be inferred merely from these acts.
But the argument was presented in a more forcible manner as to the abandonment of the decree. Admit, it is said, that no one of these acts referred to amounts to a legal or equitable discharge of the decree, it is proved that there was an understanding that the decree should be considered satisfied, and all these acts together show that Asa Colton and wife and "William Schenck acquiesced in that understanding. These acts all show one thing most incontestably, and it is this, that if any one ever understood the decree was satisfied, no one understood or supposed that the debt secured by it was paid or settled. All these acts, which are now brought up in judgment against the defendants, as evidences against them, were nothing more than honest efforts on their part to secure their debt. They are all consistent with the fact, that the debt was acknowledged due, and was secured by that decree. They do not prove that these defendants, without any consideration, released the only security which they had for *40 their debt, and that, too, without taking any evidence that the debt itself was still in existence. Had this been a question in which Colton and wife, William, and John C. Schenck, only were interested, I cannot think a controversy could have arisen upon the evidence in this case as to the rights of the defendants to enforce the decree. It is the hardship of the complainant’s situation that has excited a sympathy, which has given an importance to these various circumstances that they would not otherwise have possessed.
It is said, however, that the complainant stands in a very different position from that of John C. Schenck. True, he does. But let us see whether his equities, as against these defendants, are superior to those of John C. Schonck.
I shall examine this part of the case in the most favorable light it can be viewed for the complainant. I shall consider him as standing in the place and stead of James Bishop, and entitled to all the equity which Bishop could have claimed under his mortgage.
On the 30th of March, 183T, the amount of the lien on the decree first to be satisfied was $10,203.99, On that day, this amount was paid off, and on the same day James Bishop advanced to John Gulick, who had purchased, and then held the equity of redemption in the premises embraced in the decree, $5969.46. It is alleged that this money was appropriated to pay, in part, the first lien on the decree. This was not proved, but may, I think, be admitted without affecting the controverted question. John Gulick gave to Bishop his bond, to seoure the money he had advanced, and a mortgage upon the premises. The bill charges, that on the same day the execution upon the decree was settled between the parties, and a new arrangement made between them; that the mortgage from Gulick to Bishop was made cotemporaneously with the settlement of the execution.
Then the bill states, “ the arrangement that was made, as *41 your orator is informed and believes, was this: the said James Bishop was willing to take a mortgage upon the said 157 acres of land, provided it could be cleared of all existing encumbrances. This could only be effected by a satisfaction of the execution issued out of the Court of Chancery, and then in the hands of the sheriff. With the money thus obtained from the said James Bishop, together with other moneys raised by the said, John Gulick, the whole amount of principal and interest due to the said Caleb and Enoch Johnson was paid, together with the costs of the said suit and the sheriff’s execution fees. In what way precisely the legacy of the said Margaret Colton and William Schenck, and the amount due to them under the execution was satisfied and arranged, your orator,at this distance of time, and in consequence of the death of the said John C. Schenck, has not been able to ascertain. It was an arrangement, however, to which the solicitor of the said Asa S. Colton, and Margaret his wife and William Schenck, and also John C. Schenck, the trustee of the said Margaret Colton were parties, and with which they were entirely satisfied,.”
It thus appears that Bishop advanced his money under the belief, and with the understanding that the Chancery execution was satisfied and arranged, and the property free from encumbrances. It turns out, however, that the execution was not satisfied, and that although the parties supposed it was, there was a misunderstanding upon that subject. The question is, are these defendants responsible for the misunderstanding? Was anything done by them to mislead Bishop, and which makes it inequitable that they should be permitted to enforce their execution ? The bill does not allege that the defendants took any part in the proceedings, or that they, or either of them, ever held out to Bishop, or any one else, that the execution was satisfied or arranged. It charges the arrangement was satisfactory to the defendants’ solicitor. He had no power to enter into any arrangement to satisfy the decree, except upon a receipt of the money due upon it. He com' ploted all the arrangement he was authorized to make, *42 and that was not to enter satisfaction, hut to give a stay of the execution. When Bishop advanced his money, that decree was before his eyes open and unsatisfied; he had actual notice of it, and of the large amount due upon it; he chose to advance his money upon a vague understanding that the execution was satisfied. If he relied upon the mortgaged premises for his security, he was guilty of a negligence which meets with no favor in this court. He had not the promise even, of a reliable person, that the encumbrance should be satisfied; and so vague was the understanding upon which he relied, that neither himself, or the three other individuals who participated in the arrangement, can tell what the terms of the arrangement were. "The result of it was, that the decree and execution were considered satisfied. There is no principle of equity which will justify the court in saying to these defendants, as between them and Bishop, your conduct was such, in permitting Bishop to advance this money, that you must be postponed to a future encumbrancer.
Have the defendants, since Bishop advanced his money, done anything to prejudice his security, or the rights of any person claiming under it ? The mere delay has not prejudiced any right. If they delayed to enforce their rights under the decree, they have been vigilant in their endeavors to secure their debt. The subsequent acts of the defendants, so far from prejudicing, have benefited the complainant. The substitution of the bond and mortgage of John O. Sehenck for those of John Gulick was an act for which the complainant is alone responsible.
My conclusion is, that the complainant has not made out a case to justify me in enjoining the defendants from proceeding to enforce their execution. There must be a reference to a master to take an account of the amount due the complainant upon the decree and execution, after crediting upon the same such payments as have been made thereon.
There are one or two observations, which it appears to *43 me proper that I should make, in reference to taking the accounts, in order that both parties may be fully apprized of the views of the court upon the whole case.
The bill alleges that William Schenck’s interest was satisfied by certain bonds and mortgages, which were afterwards paid up, with the exception of a small balance of $96.24, for which he received in payment a note of John C. Schenck. The evidence is clear that the bond and mortgage given by John C. to William Schenck, of the 7th of August, 1837, for the sum of $3283.40, was in payment of what is called, the Slaybaek legacy, and has no connection with the legacy in question. This is proved by Mr. Green’s docket; and the correspondence of the amount of the bond and mortgage with that due on the legacy, with the correspondence of dates, place this matter beyond dispute. As to the appropriation of payments made by John C. to William Schenck, and of which no special appropriation has been made between the parties, whether they are to be applied upon the decree or upon other claims of William against John O. Schenck, is left an open question for the master; the parties being at liberty to take such additional evidence as they may see proper.
In reference to the payments to be allowed on the amount decreed in favor of Asa S. Colton and wife, there is more difficulty. It appears, from the evidence now in the case, that if all the payments made were credited upon the decree, it would be satisfied. Colton and wife allege that they had another claim against John C. Schenck for the Slaybaek legacy, and that the payments made, or a part of them, have been appropriated upon that claim.
Tor the Slaybaek legacy, there was a decree in favor of AsaS. Colton and wife for $8187.82, and in favor of William Schenck for $3187.82. The prior encumbrances amounted, on the 21st July, 1837, to $8840.47. The property was sold under and by virtue of the decree, and the net proceeds of sales amounted to $12,889.50. William *44 Schenck’s interest in that decree was liquidated by the bond and mortgage before referred to. This left in the hands of the sheriff more than money enough to satisfy the Coltons’ claim, with a surplus of upwards of five hundred dollars in his hands. On the 2d of August, 1837, the sheriff paid to the solicitor of the Coltons and William Schenck $3419.75, and the solicitor gave him a receipt, as having received that amount in part of claim of Asa S. Colton and William Schenck. On the same day, the sheriff paid to John C. Schenck $629.08, surplus money in his hands. William Schenck’s claim being satisfied by the bond and mortgage, Colton and wife were entitled to receive the amount paid to the solicitor, which was sufficient to satisfy their claim. The Slayback legacy was paid and extinguished, and Colton and wife could have no further demand for it upon any one, except upon their solicitor. If John C. Schenck afterwards became indebted to them, they must show such indebtedness: if they cannot, any payments afterwards made must be appropriated to the payment of their claim upon the decree in question. I have not overlooked the fact, that John C. Schenck afterwards received the dividends from the assignee for claims presented on behalf of Colton and wife. But there is nothing in the receipts which John C. Schenck gave for the dividends, nor in any other exhibit, to show that these dividends were upon anything except the homestead legacy. The claim filed did, it is true, embrace both legacies; hut that claim was presented in 1836, a year before the Slayback legacy was paid by the sale under the decree. It is very certain, if Schenck did receive a dividend on that legacy, it was a fraud upon the other creditor ; for that legacy had been paid, and could not be revived again in any shape. It was suggested that the solicitor paid over the money he received to John C. Schenck. There is no evidence of this. If he did, it did not revive the debt due upon that decree. If he paid it with the consent of Colton and wife, it created a new *45 debt from John C. Sclienck to them. How be could get a dividend on it, I cannot conceive. This whole matter is open to further investigation before the master.